IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **UNDER SEAL** |
| v. | |
| **EDDY BLIZZARD** | Case No.   1:21-mj-1119 TMD |

**AFFIDAVIT IN SUPPORT OF
CRIMINAL COMPLAINTS AND ARREST WARRANTS**

I, Loi Cao, being duly sworn, hereby declare as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been employed with the FBI since October 2008. From November 2014 until the present, I have been assigned to investigate violations of federal law involving a range of white-collar criminal violations. I have completed several computer internet fraud in-service training courses. During these courses, I received training concerning the use of computers, IP addresses, and email servers, among other things. I am also a Certified Public Accountant and have been trained in the use of numerous financial computer systems and databases. Over the course of several investigations, I have consulted with other cyber professionals in the law enforcement field regarding the evidentiary value of computers, storage devices, email and cell phones in conjunction with financial and criminal investigations

2. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the

requested warrants and does not purport to set forth all of my knowledge of the investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

3. I make this affidavit in support of a criminal complaint and arrest warrant for the individual listed below. Based on the following facts, there is probable cause to believe that, in the District of Maryland and elsewhere, **EDDY BLIZZARD** committed wire fraud in violation of 18 U.S.C. § 1343 and aggravated identity theft in violation of 18 U.S.C. § 1028A.

## BACKGROUND

4. **EDDY BLIZZARD ("BLIZZARD")** is a resident of the state of Maryland and was employed at various financial institutions as an investment advisor. **BLIZZARD** held several licenses that allowed him to operate as a registered broker and a registered investment advisor per the Financial Industry Regulatory Authority ("FINRA"). He passed several examinations in his field to include the Series 7 General Securities Examination, the Series 26 Investment Company Products/Variable Contracts Principal Examination, and the Series 66 Uniform Combined State Law Examination. By passing these examinations, **BLIZZARD** could work as a broker selling securities, i.e. stocks, bonds, mutual funds, and other investment products. They also allowed **BLIZZARD** to work as an investment advisor who is paid to provide advice about securities to clients.

5. Your affiant's review of the FINRA website revealed that from 2001-2003, **BLIZZARD** was employed by UBS Paine Webber, Inc. In 2003 he was employed by All First Brokerage Corporation, and from 2003-2014 he was employed by M&T Securities, Inc. From 2014-2017 he was employed by SunTrust Investment Services, Inc. **BLIZZARD**'s employment with M&T and SunTrust were both in the state of Maryland.

6. Victim R.M. was a resident of the state of Maryland and was 75 years old in January 2020 and had only received a ninth-grade education.[1] On December 12, 2019, R.M. was interviewed as part of this investigation. R.M stated to investigators that beginning in 1963, R.M. went to work for a Baltimore, Maryland based commercial air-conditioning company. R.M. was illiterate and could neither read nor write. However, despite the inability to read and write, R.M. enjoyed a successful career installing commercial grade air conditioning units around the country and was offered supervisory positions at the company, but had to decline due to his illiteracy. R.M. was able to continue as an air conditioning technician by memorizing facts and figures and conceptualizing things visually. In order to make extra money, R.M. told investigators he routinely worked approximately 15-30 hours of overtime per week during his career.

7. In 2003, after approximately 40 years of service with the commercial air conditioning company, R.M. took a buyout and retired. R.M. spent the first six months of retirement crabbing and fishing while living in a rowhome in Arbutus, Maryland. After that initial six months, R.M. decided to invest his retirement funds in order to provide some inheritance for R.M.'s grandchildren, so R.M. sought investment advice from the institution with which he had depository accounts, M&T Bank.

### BLIZZARD EMBEZZLES R.M.'S LIFE SAVINGS

8. Sometime after R.M. began investing with M&T Bank, **BLIZZARD** began working at M&T, and R.M. met **BLIZZARD**. **BLIZZARD** worked at the Catonsville, Maryland branch and R.M. began using **BLIZZARD** as his financial advisor. R.M. stated that in or about 2005, **BLIZZARD** "went on his own" meaning that **BLIZZARD** began working as an independent financial advisor and asked R.M. if R.M. wanted to leave M&T Bank and use

---

[1] R.M. passed away on March 20, 2020.

**BLIZZARD** as a full-time financial advisor. **BLIZZARD** told R.M. that it would be a while before he had his own office, but he would continue to work out of the Catonsville, Maryland branch of M&T Bank. Your affiant knows, based on a review of publicly available FINRA records, that **BLIZZARD** never went to work as an independent financial advisor.

9.  Approximately once a month, R.M. would drive from his new home in Chester, Maryland on the Eastern Shore to meet with **BLIZZARD** in Catonsville, Maryland approximately one hour away; however, R.M. and **BLIZZARD** would meet in **BLIZZARD**'s car, not the M&T branch office. While R.M. did not think it was appropriate, R.M. continued to meet with **BLIZZARD** in that way. These meetings lasted 30-45 minutes and R.M. was never told why they were meeting in **BLIZZARD**'s car.

10. After having invested through **BLIZZARD** for a while, **BLIZZARD** began asking R.M. for signed blank checks. R.M. thought this began sometime after purchasing R.M.'s Chester, Maryland home, which occurred in 2010. R.M. recalled giving **BLIZZARD** 15-20 signed blank checks. **BLIZZARD** filled in the rest, but R.M. did not know what the checks were for. When R.M. received the cancelled checks in the mail, he knew **BLIZZARD** had written them out since he recognized **BLIZZARD**'s handwriting.

11. When R.M. needed cash, R.M. went to the local M&T Bank branch and wrote out a check to "CASH" since R.M. could not use an ATM due to R.M.'s illiteracy. While R.M. was illiterate, R.M. could copy words. On approximately 12 different instances, R.M. went to the bank to withdraw cash and was told there was not enough money in the account. R.M. would then call **BLIZZARD**'s cell phone ending in 0164 and explain there was a deficiency in R.M.'s account. **BLIZZARD** would then tell R.M. to wait a day or two and there would be funds in the account

to withdraw.  R.M. never asked **BLIZZARD** why there were no funds in the account or how those funds were replenished.

12.    During the years of investment with **BLIZZARD**, R.M. believed that R.M.'s retirement funds were protected, meaning they would not lose value – a fact that was told to R.M. numerous times by **BLIZZARD** and **BLIZZARD**'s wife.  R.M. also believed that R.M.'s mortgage was being paid by **BLIZZARD**.

13.    R.M. realized there was a problem in August of 2019.  While preparing to go on a family vacation, R.M. attempted to withdraw $1,000-$1,500 in cash from the local M&T Bank and was told there was not enough funds in the account.  R.M. attempted to contact **BLIZZARD** on his cell phone but got no answer and attempted to contact **BLIZZARD** for one week thereafter but received no response.  R.M. then went to **BLIZZARD**'s Perry Hall, Maryland residence and attempted to talk to **BLIZZARD** in person.  R.M. knocked on the front and back door of **BLIZZARD**'s residence, but no one came to the door.  While R.M. was there, R.M. received a voicemail from **BLIZZARD**.  **BLIZZARD** stated the neighbors had called him and were complaining about the banging on the door, thinking R.M. was attempting to rob **BLIZZARD**'s residence.  **BLIZZARD** further explained that all of R.M.'s money was gone, and that **BLIZZARD** had attempted suicide at his parent's Myrtle Beach, South Carolina home, and was currently hospitalized.

14.    On September 19, 2019, **BLIZZARD** sent an email to R.M.'s son.  R.M.'s son had sent a message via social media to **BLIZZARD**'s wife enquiring about what happened to R.M.'s money.  In his email, **BLIZZARD** stated "*I'm so sorry for what has transpired and honestly this is a nightmare.  I really can't email too much because I am monitored but I made some bad investments that I could never predict would of [sic]ended the way they did. And I tried so hard*

*to get it back for everyone. I would never ever intently hurt [R.M.]. He's been my close friend for almost 12 years now. He's been to all my kids [sic]birthdays, and I have many of times invited him up for the holidays. He is family. I honestly love him like a dad. And I think that's why I have tried to End my life. Failing a friend like him, losing my wife, kids is honestly why I am here right now. I'm going to miss talking to him on a weekly basis so much…"* Your affiant believes that **BLIZZARD**'s reference to being "monitored" was related to previous statements to R.M. that **BLIZZARD** was in a hospital.

15. As part of this investigation, BLIZZARD's mother and stepfather were interviewed. BLIZZARD's mother stated she had only met R.M. a few times, that she had never owned a boat and R.M. had never purchased a boat for (or from) her. BLIZZARD's mother also stated the last time BLIZZARD was at her home was the summer of 2019 and that he never attempted suicide there, nor had he been committed for psychiatric evaluation. BLIZZARD's mother indicated BLIZZARD had visited with his children and then returned home to Maryland without incident. BLIZZARD's mother also stated that was the last time she had seen BLIZZARD in person.

16. Your affiant believes that **BLIZZARD** was not hospitalized at the time, as it is unclear how **BLIZZARD** had a phone while being hospitalized and could be contacted by neighbors and, in turn, contact R.M. Your affiant knows, based on experience, that most hospitals typically prohibit cell phone and social media use by patients who have been committed for mental evaluation based on an attempted suicide.

### FINANCIAL ANALYSIS OF BLIZZARD'S AND R.M.'S ACCOUNTS

17. A review of R.M.'s depository and investment accounts showed that between January 2013 and August 2019 there were a total of 242 distributions totaling approximately $1.4

million, from R.M.'s retirement accounts. Of which, 129 distributions totaling $1.2 million were specifically requested from R.M.'s retirement accounts rather than regular systematic annuity payments. After taxes and surrenders fees were deducted from those requested payments, approximately $1 million was deposited into R.M.'s M&T Bank account ending in 0347.  Your affiant believes that these requested withdrawals from the investment accounts of R.M. were made by **BLIZZARD** since R.M. was illiterate and could not navigate a website, enter a log-in or password, or fax a request to the institution.  Since **BLIZZARD** was an investment advisor who routinely would make transactions on behalf of clients, had knowledge of R.M.'s accounts, as well as R.M.'s personally identifying information, **BLIZZARD** had the knowledge and information necessary to make transfers from R.M.'s investment accounts without R.M.'s knowledge. Pursuant to a Grand Jury subpoena, Fidelity provided login information from R.M.'s, **BLIZZARD's**, and **BLIZZARD's** wife account.  During the period from on or about May 10, 2017 to on or about November 8, 2018, there were numerous times that the same IP was used to log on to all three accounts. On multiple occasions, the same IP address was used to login to **BLIZZARD** and R.M.'s account minutes apart.

18.     This review also revealed that from April 2016 to April 2019 **BLIZZARD** deposited approximately 112 checks drawn on R.M.'s account into various bank accounts at M&T Bank and Capital One that where held by **BLIZZARD** jointly with his wife or individually.  These checks totaled approximately $848,000 and were written to **BLIZZARD** or **BLIZZARD**'s wife. A review of these checks showed that almost all had comments written on the memo section indicating various purposes such as payment of property taxes, construction, boat payments, and down payments for a new house.  Among these checks was one check dated December 6, 2016 written to "Eddy Blizzard" for $17,500.  Hand-written in the memo section for that check were the

words, "Eddy Parents Boat Payment #2." This check was deposited into **BLIZZARD**'s M&T bank account ending in 8704 on December 8, 2016. The check was returned due to not sufficient funds in R.M.'s account. The check was redeposited into **BLIZZARD'S** same account on December 16, 2016. In April 2017, there was another check dated written to "Eddy Blizzard (Parents)" for $19,500. Hand-written in the memo section for that check were the words, "Final Boat & Fish Payment Thank You." That check was deposited into **BLIZZARD**'s M&T Bank account ending in 1926.

19. R.M. also received a letter from the IRS but did not know what it said because of his illiteracy and because **BLIZZARD** had instructed R.M. to turn over all mail to **BLIZZARD**. R.M.'s relatives later determined that R.M. owed approximately $63,000 in federal income tax due to disbursements from R.M.'s retirement accounts that were stolen by **BLIZZARD**.

20. This investigation was also able to determine that **BLIZZARD** had accounts with Venmo, and PayPal, linked to **BLIZZARD's** email account. Your affiant knows, based on his knowledge, training, and experience, that PayPal and Venmo are money transfer systems that allow for instantaneous, or near instantaneous, transfer of funds from a linked bank account or debit card. These systems are linked to an email account that the user must input to obtain access and to receive confirmations of money sent or received. As part of this investigation, **BLIZZARD**'s PayPal and Venmo accounts were obtained. A review of those accounts showed that on November 18, 2016, **BLIZZARD** sent a transfer of funds via PayPal for $6,490 from **BLIZZARD's** joint M&T Bank account ending in 8704 to a third party in Charlotte, North Carolina with the initials E.B. That PayPal transfer was funded by a $12,350 check written on R.M.'s M&T Bank account that was deposited on November 17, 2016 into Blizzard's joint M&T Bank account ending in 8704. Your affiant knows, based on the interview with R.M. and a member

of R.M.'s family, that R.M. was not seeking to purchase a new home, nor had R.M. purchased a second home to rehabilitate.

21. On January 9, 2017, a check for $25,000 was written on R.M.'s M&T Bank account and deposited into **BLIZZARD**'s joint account at M&T Bank account ending in 8704. The memo section said, "Third Payment Boat and Landscape House #3." On January 10, 2017, **BLIZZARD** sent three PayPal transfers totaling approximately $4,500 and one Venmo transfer for $2,500. Your affiant knows, based on interviews with R.M. and a member of R.M.'s family, that R.M. was not seeking to purchase a new home, nor had R.M. purchased a second home to rehabilitate.

22. A review of accounts operated jointly or individually by **BLIZZARD** showed that from April 2016 through April 2019, there were approximately 861 cash withdrawals totaling $513,695. Based on the nature of cash transactions, your affiant does not know how those funds were used; however, your affiant knows, based on his knowledge, training, and experience, that money to fund investments accounts is typically not paid in cash. and **BLIZZARD**'s statement to R.M.'s son that **BLIZZARD** had made some "bad investments" for R.M. was false. In or about the fall of 2019, R.M.'s home was put into the foreclosure process because of lack of payment which R.M. thought was being handled by **BLIZZARD**.

## **CONCLUSION**

23. Based on the information set forth in this affidavit, I respectfully submit there is probable cause that **EDDY BLIZZARD** committed the offenses of wire fraud in violation of 18 U.S.C. § 1343 and Aggravated Identity Theft in violation of 18 U.S.C. § 1028A.

_____
Loi Cao
Special Agent, FBI


Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed. R. Crim. P. 4.1 and 4(d) this ___14___ day of __April__, 2021.

_____
Hon. Thomas M. DiGirolamo
United State Magistrate Judge